May it please the court. I'm here on behalf of Mr. Robbins. I'd like to raise to the court first the issue of legally insufficient evidence. This is a case in which there were some convictions for money laundering and willful failure to file a form of $10,000 or more in cash. I think what to start with here is prosecutors said to this jury, admitted to the jury, a legitimate business. Secondly, and importantly, this is a rare case. I'm sorry, that Mr. Robbins had a legitimate car business? Yes, a legitimate car business, and the record here is in business for years, thousands of cars. But does that mean he could not have been convicted of any of these counts? No, but in context, I think as we move toward, we're here about five cars out of thousands. So does it fit someone? Does this person have the requisite mens re, which are high, particularly for a non-participant? You mean it's only five out of thousands that vitiates mens re? No, no, Your Honor, but what really I would point to then is as first and foremost. And that is that in the nature of really what is claimed here, that there's no evidence of any prior ongoing relationship with these five purchasers as far as any knowledge of drug dealing, that sort of thing. With respect to one of the purchasers, I thought there was from 2004 when the individual showed Mr. Robbins the drugs that he was dealing, in fact. Yeah, actually he was not the purchaser, and that's critically important. The purchaser was Penick. You're referring to Lloyd?  The purchaser. Weren't they co-purchasers? No, no, only according to Lloyd's testimony, Penick was the only purchaser. And, in fact, Penick had gone in and negotiated and purchased the vehicle before Lloyd ever showed up. This is Lloyd's testimony. Penick then came to Lloyd and said he will not take cash. He had tendered cash. He will only take cashier's checks or money orders. Lloyd was never a part of that transaction, never had any testimony as to what was said in that transaction. And the most important thing about it is then if we look specifically at Lloyd, Lloyd said several things. He said, I'm a drug dealer, Penick was a drug dealer, we kept it secret. He also said we had Didn't he testify that he told Robbins that he sold drugs? Well, again, and this is Lloyd now. And it's not, and there's no evidence that Robbins knew that Penick was a drug dealer and that at the time, years later Didn't Lloyd testify that Robbins instructed them to structure the transaction so that they could avoid reporting? Oh, absolutely not, Your Honor. No testimony of that whatsoever, whatsoever in this case. What the only evidence in this case is Lloyd's testimony saying that Penick came and told him that Robbins would not take cash. He would only take cashier's checks and money orders. There was nothing said, no evidence in the testimony. What Lloyd said was it was Lloyd and Penick who then went out and said, We are going to structure this by going to banks and get checks under $10,000. So there was never a communication to, here, take the cash. Now, by the way, and here, this is, I think, in the government brief, page 34, in which the government says most damning, the most damning evidence against Mr. Robbins. So if this falls, I submit, there's nothing there. The most damning is that when Penick offered cash, Mr. Robbins said to Penick, I don't take cash. I only take checks and money orders. That's at page 34. Now, they couple that with then saying, the prosecutor asking Lloyd, he's the only witness on the stand, and says, well, why do you think he only would take cashier's checks? And Lloyd's, and this is the entire rest of the argument of the government of what they claim is most damning, saying, I guess because it was for over $10,000. I guess, I guess. That's speculation. We don't convict on speculation, and that's Hornbook law. Could you help me think about this in a more general way? And we have a number of counts here and a number of transactions in which there are varying amounts of cash transported in various kinds of bags, and there are cashier's checks and so on. And I just, I looked back at Henry, which we found, which is another money laundering conviction in which we found the evidence was sufficient, which seemed to me distinguishable because then it was undisputed that the defendant knew that the individual proposing the transaction had been involved in drug trafficking. Here, to me, it's not so clear, but we have a number of factors. We have the use of a nominee or maybe gift recipient to take title to the car. We have the kind of car purchased in maybe one or two cases. We have allegations and testimony about someone's reputation, although not necessarily the defendant's knowledge. We have a number of cashier checks tendered in some instances. In some cases, the elaborate nature of the transactions, that is multi-part transactions. And maybe the style of the bag used, a Louis Vuitton bag to transport $38,000 in cash. And, you know, and obviously there are different configurations for different of these transactions, but you do acknowledge that the willfulness and knowledge element are sometimes going to be shown by circumstances. Well, first, and looking at the broad view here. Yeah. I would respectfully submit that with any of these facts in this particular case or any number of factors that you might say, Mr. Robbins responded as any legitimate, upright business would do. I mean, you go into a car dealership and you buy a car and they say, cashier's checks. You can't walk in usually with cash. And the thing that the government wants you to ignore are their own witnesses who said there were no conversations. This did not happen. But he did take cash, didn't he? $8,000 up front in cash, $5,000 in cash. Let's see, $15,000 up front in cash on different transactions, right? Well, most often he said cashier's checks. He said the reason was he'd been robbed, which makes a lot of sense. But what I'd also say, and it's in the case law, and there's a Tenth Circuit case I cite in the brief, and it makes perfect sense. Tender of cash alone is not sufficient to satisfy the element of proof of concealment. Well, it's not tender. He accepted cash in some circumstances. And payment in cash. Oh, I see. And there's a Tenth Circuit case that says open payment with you can pay $100,000 in cash. If that's the fact, that is not sufficient evidence to prove the concealment element. It's open. But I thought you were just saying that he did not take cash. Well, I mean, we have a case that's not even as stronger than that. Often he's saying, I want a cashier's check. Why would I? Respectfully, Smith, this just doesn't make sense. Because what if there's tender of cash? I mean, what would, if he really had knowledge of this, you would never turn around and say, go get cashier's checks. You would say, give me the cash. If you say, go get cashier's checks, you're leaving a paper trail. So I'm a little confused about one thing, because I thought there had been testimony also that many of his customers paid in cash for a cashier. Isn't that right? Yes. And that was kind of reflective of kind of the financial circumstances of many of his customers. And, I mean, also, this is a hardworking man. Again, undisputed. Started repairing cars inside of his house. Making money on $100 a time. And, by the way, another thing to say about this case is, if he was really involved in something criminal, don't you think? And it is. I'm not saying common sense. Right out of this Court's case law that you would expect to see this kind of evidence. These were market value transactions in which he made nominal amounts on the cars. Now, this Court, in saying what's indicia of this. And is that when you say these are? So that's so even of the $48,000 Range Rover sale? Yes. Yes. And the reason we know it is that the records of the financing of these cars. So we see what he bought the cars for. We compare it to the sale price. And the most he was making, a couple of thousand dollars. One transaction here that they're over, $100. Another transaction, he probably lost money. But is that the test? How much profit he makes? Is that the test? It is. It is. Certainly, this Court, and it's in the line of cases that I cited to this Court, of dealing with it. You know, when you're trying to rely on circumstantial evidence to establish mens rea, you've got to be showing more. And this Court said. That would be showing how much profit more? Well, this Court said substantial profit, demonstrating a role, substantial profit. Now, here we have no profit any different than any other car deal. Well, actually, I think he was probably giving pretty good deals. I mean, if I had, if I knew that a car dealer, I bought a car, and I'm, you know, the car dealer is only making a couple thousand dollars or $100, I'd be saying, you're going to go out of business pretty fast. Counsel, I'm sure I should know this, but I don't. Were you trial counsel? I was not. You were not. I'm CJA assigned counsel. And, you know, what I would say, too. Just for the appeal. Just for the appeal. Yes, Your Honor. No, I, you know, I looked at this case. Every bone in my body says that this man is innocent. You know, what about the 2001 GMC Yukon, 2006 sale? Apparently it was for $25,000 in cash. This is Stevenson? Yes, Stevenson. And as I understand it, Stevenson was buying the car, but Mr. Robbins didn't report the cash sale. He registered vehicle in Mr. Stevenson's stepfather's name. He put a lien on the Yukon, even though he was getting full payment, and the government argues that these were all indications of knowledge and intent. As I recall the testimony. And they knew each other. They were high school friends, too, right? Well, I will repeat as accurately as I can my recollection of the testimony. First of all, they had no relationship. The testimony was by Stevenson, we barely knew each other in high school. We didn't know each other after. That was the testimony. Those things couldn't a reasonable jury find from, you know, putting a lien on it even though he got full payment and putting it in someone else's name. Don't those things evidence an intent to evade? As I recall the testimony here was he paid $15,000 down and the rest was to be paid, he was going to pay over a period of months. So putting a lien on a car, absolutely you put a lien on a car when you have unpaid amount. Maybe the government can correct us. I thought it was $25,000 in cash. It may have been cash, but it was over time. And this was Stevenson? Yeah. Stevenson. I thought the quoted price was $25,000 and $15,000 was paid up front in cash and $10,000 was made in payments a week later but also in cash. A week later? Over. Pardon me? I have at the record Stevenson's testimony at the record at A299.300. This is out of my brief. And it says Stevenson admitted he left the dealership and, quote, borrowed the money for the $15,000 down payment. Stevenson paid in cash as to the balance, Stevenson, and then this is a quote from the record, just told Robbins he would pay, give him the $10,000 later. And that's at record page A296-97. So you'd put a lien on the car. The other thing is, and importantly, Stevenson. We only had two buyers. The government called to testify. Both of them said he did not know. The first buyer said we're not drug dealers. Where do you get this from? I got it from my tax return. The second one is Stevenson. Stevenson has a legitimate business. He has a bar. It's a cash business, too. And he says, I kept secret that he did some minor drug dealing on the side. And he said repeatedly to the prosecutor, I never told him that I was a drug dealer, that any of this was any drug money. But why do we have all the nominees? Why is no buyer? It's an easy one. Now, the government uses the word nominee. Okay? It sounds bad. What was it that when you look at the record, you look at what these witnesses said. They said that, let's say, for example, the aunt and the aunt of Lewis. Lewis came to his aunt and said, I want to buy a car. I want you to insure it for me. Common practice. I mean, I'd do it for my own kids. Stay with the $25,000, the Stevenson stepfather. Explain that. I'm sorry? I said, why don't we use the example that we were talking about where the stepfather, I think, is the ---- Adams and Stevenson. Yes. Yes. All right. So, well, the record is a little heat. First of all, I'm sorry. The grandfather was C.J. Jackson. So Stevenson actually testified. I thought it was the stepfather, Thomas Adams. Oh, Thomas Adams. Okay. Yeah. I'm trying to remember this one, Your Honor. All I can tell you ---- This is the $25,000 cash example that we were talking about before. All right. My general recollection, and I can, you know, because I'm remembering the other transactions, and I'm just going blank on this particular one, was that when it came to nominees, and we're using the government's term, nominee, it was often there was a benefit and it was testimony that I wanted to insure it in the other person's name. I'm doing a benefit for them. Either I have a better rate or they can't get insurance. That's a generalization. I do not recall specifically as I stand here. I'm sure it's in my brief as to exactly what the testimony was. But I think the most important thing about it is Stevenson repeatedly saying, I did not tell him anything. Now, if I can, and just quickly on this one last thing, here's this. I talked about the most damning, what they claim is the most damning, and I'm trying to encapsulate this for the Court. The other thing that the government tries to hang its hat on are some discrepancies in the purchase agreements. And first of all, it's just the Love-Davis agreement. They got on the stand. They said, look, yes, there are two bills of sale. The reason there's the two bills of sale is the first we did, we said we would give you a trade-in, a trade-in of our other car. And Robbins was a good guy. And he said, look, if you can sell it for a better price, you know, we'll come back, we'll redo the transaction, just buy it. And that was, and they said, that's the reason for the second bill of sale. And then the other ones, there's, yes, you look at it and there's saying the vehicle price is different from what the testimony was. Well, all right, I can't say. They didn't produce the people other than Stevenson who said there was nothing wrong with this. And also Latoya, his ex-wife, saying I fill out the forms, he did not. So I can't say how the numbers got there, but I can tell you what it absolutely does not prove. And actually it's proof positive it was not hiding. And that is he was not participating in hiding drug proceeds from the government and failing to file that form. And the reason is the two purchase agreements that the government points to, oh, different prices. Yeah, different price, $22,000, $23,000. You're not hiding. It's got to say under $10,000 to be hiding. If that was the proof. Now, they point to another one that says $1,300, which makes no sense. By the way, on the contract, no question, Jerry Robbins' signature is forged. He had nothing to do with writing it. How? How do we absolutely? Finish up. Yeah, and my last thing. How do we know absolutely had nothing to do with the form? It's his forged signature. I don't know how it got there. It's spelled as a signature, G-E-R-R-Y. His name is J-E-R-R-Y. Who in? If you sign your signature, you don't misspell your name. So he had nothing to do with that. I would submit I don't know there's some other reason. Maybe it's the monthly payment where he had the rest $10,000 to pay off, and he said he was going to pay off in months. That would make sense. The point is that what the government rests on is pure speculation. It would be, and let me rest with this, it would be as if the kinds of inferences that they want this Court to draw here is as if you would say as a matter of logic, drug dealers use the phone to make phone calls. I called my wife yesterday. I am a drug dealer. That's an inference. It's a bad inference. Thank you. Thank you. Monica Richards, United States of America, on this appeal. If I could just, before I lose my pencil page here and my brief, I'd refer the Court to page 301 to 302 for the judge's reference to the payment. The car hadn't been paid off within a week. That's the $25,000. With regard to count three, yes. That he paid it off at the bottom of $300, paid it off in about a week. Did he pay it off in payments? Yes, as was referenced in payments, but within a week, $3,500, and then I don't remember from there. So within a week of the deal, it was paid off. And notably, the next section there on page 301, did you know there was a lien placed on the car? No, I did not. He didn't learn about the lien until a number of years later, speaking, I'm sorry, of Mr. Stevenson. That said, I appreciate the Court's focus on that count, on count three. Certainly the evidence on counts three and counts eight was strongest with regard to the nature of the transactions and the illegalities that occurred. With regard to that specific transaction, count three, as was noted, that car was purchased $25,000 cash. There's no dispute about that at all, that it was $25,000 cash that was not reported. We have evidence in the record. Count seven, which is a 2007 purchase of a Chevrolet Suburban. And rightfully, the Court would focus on that count with me. The best concession I'll make to this Court is that that's our weakest proof. It was thin. The evidence was thin. But as the judge said in the order denying the Rule 29 motion, taken in the totality of the circumstances, were that our only count? I wouldn't be here. But that's not our only count. And it's the circumstances with regard to that count, especially the fact that that ADESA record, the record from the car auction place, specifically says that that car was purchased for $10,500. That's not anybody's testimony. That's just the business record that's validated right there. The trial court concluded that that cash was, in fact, proceeds of narcotics trafficking? The trial court concluded that, right, the circumstances. Based on what? Well, that's circumstances and inference. And as was duly noted, rightfully noted. But one of those circumstances was that Davis had pled guilty to possession of four grams? Correct. In 2004? Correct. And that's a reasonable basis for concluding that in 2007 he was selling drugs? Combined with the circumstances of the sale, Your Honor. We're looking at this in the totality of the circumstances. And with regard to that, again, that car was purchased that same day for $10,500, but we have one or we've got two bills of sales copies scratched out, one found in the file jacket, one found on the desk at the dealership the day of the warrant was executed. Just circumstances there that are not your run-of-the-mill, average, properly conducted business transaction. Those inferences, and we're allowed to rely on circumstantial evidence and inferences when we're making a case such as this, support the finding, yes. I wanted to ask you about a point that is on page 106 of the blue brief. There wasn't much of a response to it in the red brief. But that is the charge. The charge with respect to Section 5322? Yes. And whether the instruction is inconsistent with the Supreme Court's decision in Ratzlaff, and in fact the charge is different from what's in Judge Sand's pattern instructions. There is a difference there. What's the government's response? Well, first, obviously Ratzlaff is an older case that everybody was well aware of it by the time this comes around. That with regard to the ‑‑ I didn't pull the brief off quickly enough here, but we're speaking of the word, use of the definition willfully, willful, willfully. And then the difference, well, the two primary differences in Ratzlaff were ‑‑ The charge was that the defendant did so for purpose of evading the reporting requirements, and Ratzlaff suggests that it ‑‑ that it ‑‑ you must charge specific intent. Right. For the purpose of evading the reporting requirements. I don't know that there's much of a difference, but the Supreme Court thinks that ‑‑ seems to think that there is a difference. But in Ratzlaff, the problem there, Your Honor, was just on the facts. The two problems there were that willful wasn't ‑‑ that wasn't part of the definition or the instruction that was provided to the jury. The district court there didn't think it even had to do that. And there, secondarily and relatedly, was that it was not a ‑‑ related to money laundering. It was a structuring charge. So there the funds had been obtained through gambling profit or debt, the other way, I guess. It was a debt that was racked up during gambling. And so he was going to pay off the debt. Ratzlaff was supposed to pay off the debt. And there was nothing in there that made those funds or made that debt inherently illegal. The charge as given is correct? When read in its totality. I conceded in my brief that the definition of willful was provided with regard to the initial instructions, not with regard specifically to those ‑‑ to that count, that set of counts. But here the instruction certainly unwillfully included an intent to do something unlawful. And that's what the Supreme Court saw was missing in Ratzlaff, that the jury had to find that he knew the structuring in which he engaged was unlawful. And that's the definition that was given in this case of willful, that it was intent to do something unlawful. So not only was it given and paid credence to, paid attention to in this case, the definition of willful, but also that was a structuring. And I think that's important to keep in mind, that in that case it wasn't something that was inherently or ‑‑ and I think the court said that actually in Ratzlaff, that they had to ‑‑ that there wasn't anything inherently wrong in incurring this gambling debt. And it specifically said ‑‑ excuse me, it specifically said unlike money laundering or tax evasion was the language that was used in Ratzlaff. Let me interrupt for a second to just ask, what is the status of the car dealership, the property? The government initially claimed it as property to be forfeited, but I believe it said then it was going to relinquish that claim and deed it back to the defendant. What is the status? That's been taken care of. Thank you, Your Honor. That's ‑‑ the matter is now closed and it's been deeded back to Mr. Robbins. He's ‑‑ So that's no longer part of the claim and it's just the 70‑some thousand dollars that ‑‑ The money. Part of the forfeiture claim. Okay. Correct. So could you speak to my general question before about the government's position on what facts are particularly telling as circumstantial evidence here of knowledge? I'm concerned about what the government has used to demonstrate the willfulness of the money laundering offense and the knowledge that Mr. Robbins needs to have had. And you seem to place great weight on the use of the nominee and the payments in cash, sometimes even the style of the bag used to transport money, but also the kind of car purchased and so on. Do you think that someone buying a car and putting title in the name of someone else is ‑‑ that's all a red flag for a car dealer? Or what else is telling from your perspective? Well, that those names weren't reflected on the forms. I mean, first off, there weren't forms filed. But on those bills of sale where there was one person who was obviously the purchaser, such as in the Stevenson Count III transaction, his name was nowhere to be seen on that bill of sale. And that car was not his, was never going to be his, and he was the only one who ever drove it. So in that context, yes. I appreciate the difference with regard to Count VII where we had a fiancé and a fiancée coming in. I appreciate the difference there. That's a different relationship. And she testified that she drove the car. But the simple fact that one person is buying or paying and the title goes to someone else is not a red flag necessarily. It's ‑‑ I don't ‑‑ I think it's a yellow flag. And I think enough yellow flags can make a red flag. But, no, just that single circumstance, standing alone, would not be the, you know, end of our proof, would not be the end of the government's case. We couldn't stand on that, no. And the government seems to rest also on the reputation that various people had for dealing drugs. But the evidence seemed sketchy about Mr. Robbins' own knowledge of that reputation. I guess I'm talking about not Lloyd so much as the other, Markell Lewis and Stevenson and so on. Was there direct testimony about his own knowledge about their reputation? There was testimony about their reputation, certainly, with regard specifically to Lewis. I'm talking about his knowledge of their reputation as opposed to someone saying that he had a reputation as a drug dealer kind of in the city. Well, no, we certainly weren't. I mean, there's no ‑‑ that's sort of the point in this sort of a case. You can't do that unless it's your diary, drug dealer came in today and bought a car. I mean, I don't really know that that, not to be flipped, but that's, I don't know otherwise here where we have testimony from people who say, I know that we have testimony from people who say, I didn't tell him I was. But that doesn't mean he didn't know based on the circumstance of the transactions that they were asking him to conduct. So reputation is a very amorphous context. It's kind of reputation in what community and what size population and in what neighborhood and so on. But also just standing alone. Again, I wouldn't stand, the government wouldn't have put this case forward strictly on reputation alone. It was the nature of the transactions. It was the type of vehicles purchased. It was the request for nominees. It was the way in which, you know, a couple of the, specifically, I'll try to be specific, but Count 19 and Lewis, this wasn't the first car he'd purchased from Mr. Robbins. There were other cars that had been purchased. So in this trading up, and we had testimony about how the trading up for flashier and flashier vehicles is a sign. With regard to Lewis specifically, we had information that he certainly was involved in drugs, had been, wasn't present at the trial because he was deceased because of involvement in drugs. And so that's not just a selling on the corner sort of reputation information. That's shot and killed because of his involvement in drugs. That's a little bit more stark in terms of what somebody in the area might have known about the person. Could you also speak to Count 8 and Penick and Lloyd? I was, your adversary said that Lloyd, who was the individual who had showed him drugs in a prior circumstance, was not the buyer of the car, I think. Well, right. That Mr. Penick was. I'm sorry to say I disagree with my counsel. It's in the record. I'll just stick with the record. That he's the one who wrote the check. He wrote one of those checks. It's on page 401 to 402. I did keep that pen handy for that page. But page 401 to 402, he was one of the ones who wrote, we got in my van, went to my bank, I deposited 9,000 cash into my bank, wrote a check out to Finish Line Auto for $9,000. So I don't know how, I'm sorry, but I don't know how my counsel is saying that. There were a lot of transactions. All right. There were a lot of transactions. There were. And then. Did the government seek a guideline sentence in this case? Yes. I'm sorry. I believe so. I don't believe that we did anything unusual here. I think that the range was based on the total money judgment or the amount of the drug trafficking, I'm sorry, the amount of the money laundering charges, which was a range of 72 to 120. I don't recall there being anything different there. And if I could, my time is up, but if I could, I do believe that most of the arguments that were made were arguments that were made to the jury with regard to knowledge, with regard to reputation, with regard to the manner in which these transactions were conducted. And that's appropriate. But the jury here had witnesses on the stand who would say, I didn't tell him I was involved in drug dealing. But they might have said, I didn't tell him I was involved in drug dealing. And that would come out the same way in black and white as, I didn't tell him I was involved in drug dealing. So our black and white record here respectfully doesn't give us the full flavor, and this Court's well aware that credibility determinations are to be made by the jury, not strictly just based on what came out of the person's mouth and what was transcribed by the court reporter, but their manner, their demeanor, and everything else that goes along with being a juror evaluating witness credibility. And I suggest that based on this record in the district court's denial of the motion for judgment of acquittal, deserves that attention to this Court, that consideration by this Court as it's due. Thank you. Thank you. Mr. Bryan. Thank you. In looking at this case, it's clear to me why the jury, no, acquitted many counts. Why did the jury, with this kind of evidence, why did the jury convict? And here the government is saying, jury, jury, jury, give deference to the jury. Well, if a jury is incorrectly instructed on what it needs to find as guilt, if we have here, and we have it here, the prosecutor saying to the jury that it's easy to convict here, easy, and the reason it's easy, all you have to find is he didn't file the form. That's what he said to the jury, and it's permeated through the instructions. Unfortunately, it's in the readback of the judge asking, answering the question from the jury exactly on this. It is in the government's indictment here to get a conviction both on money laundering and on willful failure to file the form, this form, so they could get a conviction on that. And if the jury then looks and says, it takes so little, I have to follow what the prosecutor says and what it says here. So say, for example, as an illustration, the readback, the jury saying, having a question, well, if there's an element, if you have just one, it doesn't make you guilty of both. And it was with respect to counts seven through nine, whatever it was, this was the money laundering ones. The government's indictment here said either money laundering, either concealing proceeds or failing to file the form. Now, the judge, in talking back to the jury, then saying it's an either-or proposition, saying either you have to know, and this is the judge's words. What's the specific note that came to the judge, and what's his exact response? I'm having trouble following it. If I may, Your Honor. All right. It's at A773-774 of the record here. And the judge says, and it's not great, but I'll read the whole thing just so I don't say that. Is there a question that he's asked? Yes. And the question is? The question is from the jury, and this is 770. Regarding counts three through nine, if you're guilty of one section of that count, does that automatically make them guilty for the full count? And now they're referring, by the way, here, and I pointed out, to the special interrogatories of the verdict sheet. So they say verdict page 50, verdict page 2, judge's charge page 50. Okay? So they're reading. That's why that verdict sheet is so important. It is special findings. And if that's wrong, saying the elements, and they did. They were going by what that verdict sheet said they were supposed to find. And it was absolutely wrong on what the mens rea elements, missing elements, wrong elements, strict liability on the failure to file the form. And this is the judge's response. To the question. To the question. Regarding counts three through nine, if you're guilty of one section of the count, are you guilty of the entire count? Yes. And if you look at those counts. No, that's fine. I just. And so what is the answer to that question? All right. The answer is, you look then at what the judicial explanation was of the conduct that underlies each of those counts, and it's an either or proposition. In the first instance, you have to find, beyond a reasonable doubt, the defendant knowing the transaction is designed in whole or in part, entered into it to conceal or disguise the nature, the location, the source, the ownership, the control of the proceeds of the specified unlawful activity. Now, here comes the or. Or. This is the judge. Judge's statement of what the law is. Wait a minute. This is him writing back to the jury. And saying it to the jury. Go ahead. Could you say that again? It's an awfully long response. There's jury deliberations. Jury come back. Yeah, yeah. This is the response to the note. I read the note. And now I'm reading the judge's verbal response to the jury as to the answering that question. He did it verbally? He called the jury in and gave this verbal response? Yes. He didn't write back? I'm not being counsel of the record, but from everything I'm reading from the record, this was verbal. Okay. Could you do it again? It's hard to follow. All right. I'll start from the beginning. Just with the answer. All right. You look, then, at what the judicial explanation was of the conduct that underlies each of those counts, and it's an either or proposition. First, here's the either. Don't editorialize. Just read the answer. In the first instance, you have to find beyond a reasonable doubt that the defendant, knowing the transaction, is designed in whole or in part, entered into it to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activity, or he entered into the transaction to avoid a transaction reporting requirement. That is strict liability. There is no knowing element. In this case, he should have said knowing. He should have said knowing where? Knowingly avoid a transaction reporting requirement. That is the mens rea element of that correct instruction there. And you combine that, then, with the repeated statements by the prosecutor to the jury saying, all you've got to do is find he failed to file the form. This is easy. Now, and to give credit, I don't want to, you know. We did convict on some counts just reporting and not on money laundering. And they had the special instruction form or special verdict form in front of them. I mean, what's confusing to us to listen to without the special verdict form and without the whole context, you know, is it so obvious that it was going to be confusing or incorrect? Well, it was the first of all, I think the jury honed right in on it in its question, too. And mens rea, this case was about mens rea, all mens rea. What did he know or what did he not know? Now, to give the full picture here, I say, and I said it before, but I'll say it again, because I want to make sure, correct to the record. You're way, way, way over both times. So just why don't you make the point and then conclude. In the prosecutor's initial summation, said strict liability. All you have to do is see he failed to file the form. Defense does its summation, rebuttal. Prosecutor comes back and say, and relies on Mr. Robbins' own witness, saying, well, she said that they learned they had to file the form in 2005, 2006. Therefore, if they never filed the form after 2005, 2006, he's guilty. That is incorrect under the law, what's required to be found. That is not a mens rea willful. Thank you. Thank you. Rule reserve decision. Your Honor, I'm sorry, excuse me. With regard to that, is there any way in which you can protect the plaintiff's silence in this particular case? Well, you know, I think despite the many, many, many pages of briefing we've gotten, I think there is a substantial issue as to the charge and whether it's consistent with Ratzlaff. What the trial court charged here is different from what's in Sand. And so I think I understand the government's argument that somehow the general charge on willful fixes it. I'm not sure I buy that. But I think it probably would be useful to have some additional briefing limited to this point. Well, I understand it deals with Section 5322 is what we're talking about. But if the government wants to put in something, I think that would be fine. Well, I don't want to do this now. I mean, I think the government can submit a letter brief, no more than ten pages. How much time do you want? Two weeks? And you can respond, no more than ten pages, one week thereafter. Okay? Thank you both.